431 FIFTH AVENUE CORPORATION, Appellant-Respondent, *v.* CITY OF NEW YORK, Respondent-Appellant.

First Department, December 20, 1945.

*Paul Windels* of counsel (*David B. Tolins* and *Julius J. Teller* with him on the brief), for plaintiff-appellant and respondent.

*William S. Lebwohl* of counsel (*Rose Schneph* with him on the brief; *Ignatius M. Wilkinson, Corporation Counsel*), for defendant-respondent and appellant.

CALLAHAN, J. Plaintiff is the owner of real property situated at 431 Fifth Avenue, Borough of Manhattan, New York City. The said premises are located in a Restricted Retail Use District within a " B " Area District as shown on the Use District map which is part of the Building Zone Resolution of the City of New York (N. Y. City Zoning Resolution, eff. June 28, 1940, as amd.).

The action is brought to have the rights of the plaintiff declared insofar as they may have been affected by an amendment to the Building Zone Resolution, adopted November 1, 1944.

The complaint contains three causes of action. Special Term dismissed the first and third causes of action as insufficient in law, and denied plaintiff's cross motion for judgment on the pleadings as to such causes. It denied defendant's motion for summary judgment as to the second cause of action and on cross motion of the plaintiff struck out defendant's affirmative defenses to this cause of action as insufficient in law. Appeals have been taken by both plaintiff and defendant.

We are in accord with the disposition made by Special Term with respect to all parts of the motions except those relating to the first cause of action. We deem that the first cause of action was sufficient. This opinion will be addressed solely to our reasons for upholding that cause of action.

The first cause of action rests on the theory that the amendatory resolution of November 1, 1944, was invalid insofar as it might affect plaintiff's property because it failed to receive the unanimous approval of the Board of Estimate of the City of New York. Plaintiff contends therein that under the law unanimous approval was required because protests were filed in sufficient number to require such a vote.

Two questions of statutory construction are presented. The first involves the interpretation to be given to the provisions of section 200 of the Charter (1938) relating to the filing of protests against amendments to the zoning law proposed by the New York City Planning Commission. The second involves the scope and effect of the amendatory resolution as adopted.

For zoning purposes New York City is divided by the Building Zone Resolution and the maps attached thereto, into three types of districts: (1) Use Districts (art. II); (2) Height Districts (art. III), and (3) Area Districts (art. IV).

The Use Districts regulations establish the nature of the use to which real property may be put. Nine different Use Districts are provided, designated: Residence Districts, Local Retail Districts, Restricted Retail Districts, Retail Districts, Retail–1 Districts, Business Districts, Business–1 Districts, Manufacturing Districts and Unrestricted Districts.

Height Districts are eight in number, and are separately designated by numerals or fractions representing the ratio of the limit of height permitted in construction of new buildings as compared to the width of the adjacent streets.

Area Districts are ten in number, and are distinguished by letters designated A, B, C, D, D-1, E, E-1, F, F-1 and G. The Area Districts regulations require provision for certain open yards or courts, so that, in effect, the area of a plot that may be covered by new buildings differs in each separately designated district. For instance, in an "A" Area only 75% of a plot may be covered, whereas in a "B" Area 65% may be so covered, etc.

Use, Height and Area Districts overlap upon the zoning map, so that, for example, various kinds of Use Districts are found entirely within the different Area Districts, each such Use District having its own separate boundaries.

An examination of the zoning maps will disclose that a large part of the territory in each borough in New York City is in a "B" Area District. There are about 20,000 acres of land in "B" Area Districts and only 600 in all of the various Retail Use Districts. In the borough of Manhattan substantially all but the waterfront and some adjacent blocks are in the "B" Area. Within this "B" Area are found various retail districts consisting of some of the most valuable property in the heart of the borough.

The Charter (§ 200) authorizes the City Planning Commission to make changes in the zoning laws by amending the Zoning Resolution. The section makes the following provision as to when an amendatory resolution adopted by the City Planning Commission shall become effective: "Unless the board of estimate shall modify or disapprove such resolution by a three-fourths vote within thirty days from the date of filing, it shall thereupon take effect, except that in case a protest against a proposed resolution shall have theretofore been presented, duly signed and acknowledged by the owners of twenty per centum or more of the area of the land included in such proposed change, or by the owners of twenty per centum or more of the area of the land immediately adjacent extending one hundred feet therefrom, or by the owners of twenty per centum or more of the area of land directly opposite thereto extending one hundred feet from the street frontage of such opposite land, such resolution shall not be effective unless approved by the board of estimate by unanimous vote of the entire board."

On November 1, 1944, the City Planning Commission adopted a resolution amending the Building Zone Resolution by imposing additional and greater restrictions upon the height and area

or bulk of buildings in numerous respects. While the sections regulating use were not amended, the amendments as to area were made to apply differently in different Use Districts within various Area Districts. We are mainly concerned upon this appeal with the amendments to the " B " Area regulations.

The November 1st resolution decreased substantially the amount of land that might be built upon within " A ", " B ", " C " and " D " Area Districts. It did not affect the regulations as to the remaining six Area Districts. Said amendatory resolution contained two substantially new sections altering the regulations with respect to " B " Area Districts. The first of these is subdivision (b) of section 12 of the Building Zone Resolution which, as amended, reads as follows: " § 12. *B Districts.* * * * (b) In a B district no building used for residence, and no non-residential building located in a residence district, in a local retail district, in a restricted retail district, in a retail district, or in a retail–1 district, as designated on the amended use district map, shall occupy at the curb level more than 65 per cent of the area of the lot, if an interior lot, or 80 per cent if a corner lot, exclusive in each case of lawful garages. In computing such percentage any part of the area of any corner lot in excess of 5,000 square feet shall be considered an interior lot."

The second new section which affects " B " Area Districts among others, is numbered subdivision (g) of section 19. It read as follows: " § 19. *Area District Exceptions.* * * * (g) In any use district, except a residence district, where provision is made for parking or unloading within a building, the area of such parking and unloading facilities may be added to the area permitted to be occupied by the first floor of the building. Except for the first floor, the building shall be otherwise limited by the restrictions set forth in this article."

It appears from the foregoing that subdivision (b) of section 12 made no change with respect to the existing area restrictions affecting Business, Business–1, Manufacturing and Unrestricted Use Districts within " B " Area Use Districts. The changes made by the new section affect solely the Residence Districts and the various Retail Use Districts in " B " Area Districts.

It also appears that subdivision (g) of section 19 provides an exception which applies differently to Residence Use Districts and other Use Districts. This exception permits interior spaces used for parking and unloading of vehicles to be added to the area that may be occupied by the first floor of a building in any Use District other than a Residence District.

The first cause of action in the complaint alleges, *inter alia,* that, in accordance with the requirements of section 200 of the Charter, within thirty days after the filing of the above amendatory resolution, there were filed with the Board of Estimate protests against the said amendment, signed and acknowledged by the owners of more than 20% of the area of land in all the various Retail Use Districts contained in " B " Area Districts throughout the city. The first cause of action alleges that, despite the filing of these protests, the Board of Estimate of the City of New York took proceedings which in effect approved the amendment. The vote of approval, however, was by less than a unanimous vote. The factual allegations are not disputed.

Defendant City of New York, in making its motion to dismiss the first cause of action, contends that because the amendment of November 1, 1944, was comprehensive in nature and included changes affecting various types of Use Districts in many Area and Height Districts, protests by the owners of 20% of the area of the land included in Retail Use Districts within a " B " Area District were insufficient to require a unanimous approval of the amendment. Its position is that the provision affording the right of protest found in section 200 is inapplicable to an act of the broad scope of the present amendment, but even if the right of protest does apply, protests would be required from 20% of the area of the land in all of the districts affected by any provision of the amendment, because the changes made are interrelated.

Plaintiff property owner, on the other hand, contends that section 200 of the Charter may not be construed to give the City Planning Commission the power to make the right of protest ineffective by combining numerous separate and distinct changes in one omnibus resolution. It contends that, insofar as the right of protest is concerned, the amendment must be treated as if separate changes made therein had been separately enacted. It says further that Retail Use Districts have been differently affected by the amendment from all other Use Districts by the provisions of subdivision (b) of section 12 and subdivision (g) of section 19 read together, and, therefore, protests from 20% of the property in any Retail Use District in a " B " Area District made unanimous approval necessary before the amendment could become effective as to property in a protesting district.

We construe the provision of section 200 authorizing protests " by the owners of twenty per centum or more of the area

of the land included in such proposed change," to afford the right to property owners to protest against an amendment of the present scope and nature. Although the phrases found in section 200 referring to protest by owners of land adjacent or opposite to that affected by a proposed change, seem to be limited to changes affecting single properties or blocks, the first phrase relating to protests " by the owners of twenty per centum or more of the area of the land included in such proposed change," is clearly broad enough to include changes affecting areas as a whole, as distinguished from piecemeal changes. Although numerous changes affecting some Height and Area Districts are included in one omnibus resolution by the amendment of November 1, 1944, these changes are indicated in separate sections, each affecting entirely different districts, and insofar as the right to protest is concerned, these separate sections should be considered as if they had been separately enacted. They have no more relation to each other than do the various provisions of the Building Zone Resolution which they amend.

The amendatory resolution, as drawn, after setting up the separate changes as to Height and Area Districts, contains general provisions modifying the earlier and particular provisions. This would require us, in construing the change effected by subdivision (b) of section 12, to read that section in the light of its modification by subdivision (g) of section 19, one of the general provisions. We hold, therefore, that the right of protest would be the same here as if subdivision (b) of section 12 and subdivision (g) of section 19 had been enacted in a single, separate resolution. Examining subdivision (b) of section 12 we find that it changes the area restrictions in " B " Areas, but not in all Use Districts within such areas. It omits any reference to non-residential buildings in Business, Manufacturing and Unrestricted Use Districts within " B " Area Districts, therefore, there was no occasion for owners of such property within Business, Manufacturing and Unrestricted Districts to protest against the amendment, and the land in such Use Districts should be excluded in ascertaining " the area of the land included in such proposed change ". It is true that subdivision (b) of section 12 affects all structures used for residence purposes situated in any Use District within a " B " Area District, but the changes effected by subdivision (b) of section 12 were made applicable in the main to Use Districts as a whole. While these changes were directed to area regulations and not to use, the changes made as to area regulations were applied differently with respect to different Use

Districts. Here we are concerned with the changes as applied to the several Retail Districts in a " B " Area.

We do not intend to hold that in determining the meaning of " the area of the land included in such proposed change," it would be proper to consider mere differences in the effect of the amendment on individual properties. Districts were the units that the drafters of the resolution used as a measure.

In deciding the motion to dismiss the first cause of action, Special Term indicated in its opinion that it did not accept either the contention of the city or that of the property owner. While it determined that a lesser area than all of the land throughout the city was the measure, and that the correct test was the area affected by any separable change, in applying that formula to this particular case it held that the total area in all " B " Area Districts was the land affected by the separable changes found in subdivision (b) of section 12.

We think that in this respect Special Term erred, and that at least all Use Districts in " B " Area Districts not affected by any change brought about by the adoption of subdivision (b) of section 12 should have been excluded. If this is not done, we can readily see that the right of protest provided by the statute might become illusory. If the Use Districts in an Area District which were excluded from the effect of area changes constituted 80% of all of the land in the Area District, the right of protest would disappear. Such a change might well be made in a single, comprehensive amendatory resolution.

Having construed subdivision (b) of section 12 as effecting changes in Retail and Residential Use Districts only within the " B " Area Districts, we are brought to the final question in the case. This is raised by the claim of the plaintiff property owner that the differences in the restrictions effected by subdivision (b) of section 12 and subdivision (g) of section 19, read together, as between Residential and Retail Use Districts within " B " Area Districts, were so substantial as to make these two classes of Use Districts further separable from each other insofar as the right of protest was concerned. Subdivision (g) of section 19 permits the area provided for parking and unloading vehicles within a building to be added to the area permitted to be built upon in the first floor of buildings in any Use District except a Residence District. It thus appears that in the contingency indicated, the extent to which the area of a plot may be built upon within a " B " Area District is increased as to the first floor, within certain limits, by the space used for parking and unloading, but this exception has no application in a

Residence Use District. Therefore, as to Retail Use Districts within " B " Area Districts, but not as to Residence Districts, credit may be obtained for parking and unloading areas.

If protests should be filed " by the owners of twenty per centum or more of the area of the land included ", in all Residential Use Districts within " B " Area Districts, we think it would be clear that such Residential Use Districts had been so differently affected by the amendments found in subdivision (b) of section 12 and subdivision (g) of section 19, read together, that such protests would require a unanimous vote of approval before the measure could be effective as against Residence Districts. If Residential Use Districts are differently affected by these amendments, it would seem to follow that Retail Use Districts, making up the balance of the land within " B " Area Districts, are likewise differently affected.

So construing the statute, we think that the present amendatory resolution makes the Retail Use Districts within " B " Area Districts, taken as a whole, separable areas in ascertaining " the area of the land included in such proposed change ". Having so determined, we must hold that the protests filed herein required unanimous approval by the Board of Estimate of the resolution of November 1, 1944, before that amendment could apply to Retail Use Districts.

However worthy a court might deem a proposal for further control of the density of the use of land in certain areas of this city, its duty is to enforce the law as written, and unless that law has been complied with in the adoption of a proposal, it must hold the proposal illegal.

In determining the meaning to be given to the particular phrase, " area of the land included in such proposed change," as used in section 200, we are without the aid of any controlling precedent as a guide. The question that was presented in *Morrill Realty Corp.* v. *Rayon Holding Corp.* (254 N. Y. 268) was essentially different. There an area of some sixty blocks was added to a Retail Use District.

The controlling statute required unanimous approval of a zoning change where 20% or more of the frontage proposed to be altered or of the frontage immediately in the rear thereof or of the frontage directly opposite, had protested. The protests filed in that case represented only the owners of the frontage of one of the sixty blocks affected. No pretense was made that the proposal represented 20% of the area affected. The Court of Appeals held that " frontage " meant all of the frontage affected, and not merely that of any one block. The mere

statement of the facts indicates the inapplicability of the *Morrill* case to the present inquiry.

By reason of the views herein expressed, we are required to reverse the order appealed from insofar as it dismisses the first cause of action. A stipulation having been filed by the parties withdrawing the denials of the allegations of paragraph Eighth of the complaint, plaintiff's motion for judgment on the pleadings upon the first cause of action should be granted.

The order so far as appealed from should be modified accordingly by denying the motion to dismiss the first cause of action, and by granting plaintiff's motion for judgment on the pleadings upon the first cause of action, and as so modified affirmed, without costs.

TOWNLEY and GLENNON, JJ., concur; MARTIN, P. J., and WASSERVOGEL, J., dissent as to the first cause of action and vote to affirm; MARTIN, P. J., dissents as to the second cause of action and votes to reverse the order insofar as it strikes out the affirmative defenses to the second cause of action and for summary judgment dismissing said cause of action.

Order so far as appealed from modified as stated in the opinion and as so modified affirmed, without costs. Settle order on notice. [See *post,* p. 804.]